In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-15-00161-CR**
_____

**ARMAUD SEARS, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the Criminal District Court**
**Jefferson County, Texas**
**Trial Cause No. 13-17651**

**MEMORANDUM OPINION**

Appellant Armaud Sears[1] appeals his conviction for aggravated robbery. In four issues, Sears contends that: (1) the evidence is insufficient to support his conviction for aggravated robbery; (2) the testimony of an accomplice witness was not sufficiently corroborated; (3) the trial court erred in admitting recordings of telephone calls allegedly made by Sears while in jail; and (4) the trial court erred in

_____

[1] The record reflects that Sears is also known as Armaud R. Sears, Armaud Rashad Sears, and Donovan Zeno.

1

admitting out-of-court statements by a witness who did not testify at trial in violation of Sears's Sixth Amendment right of confrontation. For the reasons set forth below, we modify the judgment to reflect a conviction for the lesser-included offense of robbery, affirm the conviction as modified, reverse the imposition of sentence, and remand the cause to the trial court for a new punishment hearing.

## I. Background

In the early morning hours of March 8, 2013, Laura Brown.[2] was at her home in Beaumont, Texas, packing to leave for a trip to Las Vegas with her boyfriend, Kadrian Cormier. In preparation for the trip, Brown had gone to an ATM the day before and had withdrawn $3,000. She put the money under her bed in a shoebox that she was planning to take on the trip. At approximately 4:30 or 4:45 a.m., Brown sat down on her bed and dozed off. Cormier, who was living with Brown at the time, had also dozed off on the bed next to her. At some point thereafter, Brown was awakened by the sound of someone banging on the back door of her house and screaming, "Beaumont Police, open the door." Brown immediately got up and began walking down the hallway towards the back door. However, before she reached the end of the hallway, three men broke through her back door and entered her house.

---

[2] To protect the identity of the victim, we will use the name "Laura Brown" throughout the opinion.

The men were dressed in black and were wearing ski masks and gloves. Brown turned around and attempted to run away, but one of the men grabbed her, put her in a chokehold, and put a gun to her head. As the man grabbed her, Brown saw her daughter wake up and get out of bed, and Brown pleaded with the man to let her daughter come to her. The man, however, stated only, "[D]o you know where he is?" Brown, who was terrified, told him that she did not know who he was talking about.

While the man held Brown at gunpoint, the other two masked men went into Brown's bedroom. The man holding Brown then forced Brown to lay down on the bed and eventually allowed her daughter to come and sit next to her on the bed. While Brown and her daughter sat on the bed, two of the men held guns to their heads. The third man grabbed Brown's son and walked through the house holding a gun to the boy's head while the man looked to make sure that no one else was in the house. Brown testified that all three of the men had guns, and she described two of the guns as handguns and the third gun as a "long" gun.

After searching the other rooms in the house, the third man returned to Brown's bedroom with her son and allowed her son to sit with Brown and her daughter on the bed. The three men then started looking under the bed in Brown's bedroom. Brown heard one of the men say, "[O]h, I found something. We got something." She also heard one of the men say, "[L]ook, it's right here, it's right

3

here[.]" The men removed Brown's money from the shoebox under the bed and took it. They also took a watch on Brown's dresser. After taking the money and jewelry, the men instructed Brown and her children to put their heads down and to wait for five minutes. The men then left Brown's house. After they left, Brown got up from the bed, locked the bedroom door, and called 911.

Brown testified that during the robbery, she was in fear for her life and the lives of her children. She stated that she believed that the men were going to kill her and her children. She explained that after the robbery occurred, she and her children were afraid to live in her house and eventually moved.

Brown testified that when she first heard the sound of banging on the back door, she and Cormier both got out of bed at the same time and started going to the back door, but when she turned around, she did not see Cormier anymore. She testified that she later learned that Cormier had escaped from the house when the intruders broke in through the back door. She recalled that Cormier returned to her house ten or fifteen minutes after the intruders left.

On cross-examination, Brown testified that she told the police that the intruders had stolen $3,000 and a watch. She testified, however, that Cormier told the police that the intruders had stolen $5,400 that Brown had received from an income tax refund. Brown recalled telling the police that the only people who knew

4

she had received an income tax refund were Cormier and a female friend of hers and that Cormier was the only person who knew where she had put the income tax refund. She did not know if Cormier told anyone else about the money in the house or if Cormier had any of his own money in the house. While Brown testified that she did not recall telling the police that the intruders seemed to know where the money was hidden, she agreed that the intruders went straight to her bedroom after breaking into the house.

Brown ended her relationship with Cormier about three or four months after the robbery occurred. She denied breaking up with Cormier because she discovered that he was dealing drugs and denied that Cormier ever kept drugs at her house as far as she knew. She testified that she had no knowledge of any drugs stolen during the robbery, and she did not believe that Cormier was involved in the crime.

Kadrian Cormier did not appear or testify at trial. However, a Beaumont police officer testified that he spoke with Cormier at the scene. Cormier told the officer that Cormier was asleep when Brown awoke him and told Cormier that someone was knocking on the door and saying they were Beaumont police. Cormier told the officer that Cormier got out of bed to see who was at the door and saw two black males wearing ski masks inside the house. When he saw the intruders, Cormier ran to the bathroom in Brown's bedroom and escaped through the window. Cormier told

the officer that once outside, he ran around the side of Brown's house, climbed over the fence, and ran out in front of the house. He then flagged down a red Toyota Tundra pick-up truck that was in front of Brown's house and got into the vehicle. Cormier described the driver of the red pick-up truck as a black male with facial hair and a short haircut. Cormier told the officer that he asked the driver if he could use his cell phone to call 911, but the driver refused, stating that he was talking to his mother and that the phone's battery was about to die. Cormier stated that while he was in the red pick-up truck, he was able to hear a male's voice on the other end of the phone and heard the driver refer to the person to whom he was speaking as a "dude." Cormier told the officer that when he heard that, he became suspicious and began to suspect that the driver of the red pick-up truck might possibly be involved in the break-in at Brown's house. According to the officer, Cormier told the driver of the red pick-up truck that he wanted to get out of the vehicle. The driver, however, said, "I bet you do, mother f----r" and refused to allow Cormier to get out of the vehicle. Cormier stated that the driver then drove the truck out of Brown's neighborhood and turned onto Dowlen Road. Cormier then decided to jump out of the truck. Cormier informed the officer that after escaping from the red pick-up truck, he flagged down a second vehicle to seek help. Cormier stated that when he got into the second vehicle, the driver pulled up behind the red pick-up truck, and

6

Cormier was able to get the red pick-up truck's license plate number. Cormier stated that the driver of the second vehicle let him use his phone to report the break-in and drove Cormier back to Brown's house. When the police later arrived, Cormier gave the license plate number of the red pick-up truck to the officer.

The officer testified that he also interviewed Brown at the scene after he spoke with Cormier. Brown told the officer that four suspects had broken into her house. She stated that the suspects held her and her children at gunpoint and that one of the suspects held her face against the mattress of her bed and threatened to kill her if she did not remain quiet. According to the officer, Brown stated that the intruders took her income tax refund, which she reported was $5,400. She told the officer that this money had been hidden in a running shoe underneath her bed. The officer testified that Brown also told him that the intruders took a watch and a ring. Brown provided the police descriptions of the four intruders that she saw inside the house. Specifically, she stated that the first suspect was a black male who was approximately six feet tall and had broad shoulders; the second suspect was a black male who was approximately six-foot, five inches tall and had a "skinny" body; the third suspect was a black male who was six feet tall with a medium build; and the fourth suspect was a short, black male of medium size. The officer agreed that Sears, who is approximately five-foot, six inches tall and larger than a medium build, did

not match any of the descriptions that Brown provided of the intruders who broke into her home.

The officer testified that while he was at Brown's house, he observed injuries on Cormier's legs that were consistent with Cormier's account of escaping through Brown's bathroom window, climbing over a fence, and jumping out of a vehicle. The officer testified that he also observed that the wooden privacy fence surrounding Brown's home had a board that appeared to have been "freshly broken." When the officer walked through the house to look for additional evidence to help in the investigation, he observed that nothing in the house seemed disturbed, except for a broken lamp and the back door through which the intruders had entered.

A second Beaumont police officer who responded to the robbery testified that when he initially arrived at Brown's home, he saw that the back door had been kicked in. Brown told the second officer that three men had entered her house and had announced themselves as Beaumont police officers. She told him that the men pointed guns at her and asked, "Where's the money?" Brown told the second officer that the only money she was aware of was the money from her income tax refund that she had just received. She stated that she, Cormier, and a female friend were the only people who knew about the income tax refund and that only she and Cormier knew where the money was hidden. Brown told the second officer that when the

8

intruders entered her home, they went straight to where the money was hidden, took the money, and left. She told him that it was as though the intruders knew exactly where the money was. The second officer testified that these facts suggested to him at the time that the robbery was an inside job, meaning that someone who knew where the money was hidden had been working with the intruders. The second officer stated that when he arrived at Brown's house, Cormier was there. He recalled that Cormier seemed calm. He testified that he did not speak with Cormier, but Cormier told another officer that he had escaped through the bathroom window.

The State introduced an audio recording of the 911 call that Brown made after the robbery occurred. The audio recording was admitted into evidence and played for the jury. The recording indicates that the call was made at 6:09 a.m. During the call, Brown informed the 911 operator that three or four black men had broken into her home and had taken her income tax check. Brown stated that all of the intruders had guns and that the intruders had escaped in a "newer model Toyota Tundra." During the call, Cormier also spoke to the 911 operator and stated that the intruders left in a red Toyota Tundra and a "newer model" silver Toyota 4Runner.

The second officer testified that right before he was dispatched to the robbery at Brown's house, he had been dispatched to a call about a suspicious truck backing up in the northbound lanes of Dowlen Road. Specifically, he was informed that three

9

men had been seen running out of a culvert and getting into the truck on Dowlen. The second officer testified that the reported location of the suspicious truck was only about half a block from Brown's house, and the culvert that the three men were seen coming out of ran behind the street on which Brown's house was located. The second officer testified that he later asked the police dispatcher to get in touch with the individual who had called in the suspicious truck. That witness stated that he was traveling north on Dowlen after leaving a local gym and saw a red Toyota Tundra truck backing up on Dowlen. He then saw three males leaving a ditch and jumping into the truck.

The witness who reported the suspicious truck testified that on the morning of March 8, 2013, he went to the gym at approximately 5:00 a.m. to exercise. Later that morning, he left the gym and began driving north on Dowlen Road. While on Dowlen Road, the witness noticed a red truck "quite a ways up" in front of him, approaching the intersection of Dowlen Road and Westgate Drive. The witness testified that the truck caught his attention because it stopped before it reached the intersection and began backing up in its lane of traffic. As the witness slowed down for the traffic light at the intersection, he passed the red truck. As he did so, he observed three people emerge from a ditch that ran along the side of the neighborhood in that area and get into the red truck. The witness recalled that the

three people were wearing dark clothing and had hoods pulled over their heads. He testified that he was unable to see their faces or if they had anything in their hands. According to the witness, it appeared that the truck had initially driven past the ditch and then backed up to pick up the three individuals. Thereafter, the truck pulled up to the intersection, and the witness was able to get the truck's license plate number. The truck then turned right onto Westgate Drive, and the witness lost sight of it. Because he thought the truck's actions were suspicious, the witness called 911 and reported what he had seen. At trial, a recording of the witness's 911 call was admitted into evidence and played for the jury. The recording indicates that the call was made at 6:01 a.m. During the call, the witness gave the 911 operator the license plate number of the red truck that he had observed on Dowlen Road.

Crystal Foxall testified that she has known Sears her entire life. In February or March of 2013, Sears asked Foxall to rent a vehicle for him, and he gave her money for the rental. Thereafter, Foxall used the money to rent a red Toyota Tundra pick-up truck. After paying the rental fee and picking up the truck, Foxall gave the truck to Sears. After that, Sears had the truck "for a while." Aside from one occasion when Foxall took the truck back to the rental company to have its oil changed, Foxall testified that she did not know who drove the truck after she gave it to Sears. She

11

also did not know the truck's license plate number and did not know why Sears needed the truck.

Darrell Bendy, an inmate, was called by the State to testify about a statement he purportedly gave to detectives in April of 2013 about Sears's alleged involvement in the robbery. While on the stand, however, Bendy testified that he did not remember providing a statement to detectives, did not remember giving the detectives information about Sears or the robbery, denied knowing Sears, and denied knowing who committed the robbery. He also claimed to have been "on drugs" when he spoke to the detectives. At the conclusion of Bendy's testimony, the State offered into evidence a document that the State claimed was Bendy's written statement, but the trial court refused to admit the document into evidence.

The detective who investigated the robbery at Brown's house testified that he took a sworn statement from Brown shortly after the robbery occurred. Brown told the detective that she and Cormier had stayed up late cleaning her house and packing to get ready for a trip. Early the next morning, she heard a loud noise, and three men invaded her home, yelling "Beaumont police." Brown told the detective that the intruders held her and her children at gunpoint and searched the house. Brown stated that one of the intruders had a rifle and the others had pistols. Brown told him that the men stole $3,000, a diamond watch, and a diamond ring. Brown also told the

12

detective that she and Cormier were the only two people who knew where the money was hidden.

The detective also obtained a sworn statement from Kadrian Cormier. Cormier's statement to the detective was consistent with the other officer's testimony regarding what Cormier told the officer at the scene. However, the detective testified that Cormier never mentioned anything to him about the silver Toyota 4Runner that was described in Cormier's call to 911.

The detective testified that after he obtained the license plate number of the red truck from Cormier, he ran the license plate number through the State database and discovered that the truck was a rental vehicle. The detective went to the rental company and learned that the truck had been rented to Crystal Foxall. Thereafter, the detective contacted Foxall, who told him that she had rented the truck for Sears.

As part of his investigation, the detective also reviewed the 911 calls pertaining to the robbery. Based on those calls, the detective contacted the witness who called 911 about the suspicious truck on Dowlen Road. The witness repeated his eyewitness account of the suspicious truck. The detective testified that the street on which Brown's home was located intersects with Dowlen Road in the same area in which the witness reported seeing the red truck. During the witness's 911 call, the witness provided the license plate number of the red truck that he observed on

13

Dowlen Road. The license plate matched the license plate number that Cormier had identified as being on the red truck that he initially flagged down and got into after escaping from Brown's house. Based on this fact, the detective testified that it was his belief that the red truck that Cormier initially flagged down was the same truck that the witness saw the three men get into on Dowlen Road. The detective testified that this evidence was also consistent with Brown's statement that three masked men ran into her home.

According to the detective, Cormier described the driver of the red truck as a heavy-set black male with a medium complexion and a "low" haircut. He then identified Sears as the driver of the red truck from a photo lineup of six men. Cormier told the detective that he was one hundred percent certain that Sears was the driver of the truck after seeing Sears's photo in the lineup. Two days after the robbery, Beaumont police located Sears driving a red Toyota Tundra pick-up truck with the same license plate number that had been identified by Cormier and the witness. Sears was taken into custody and later interviewed by the detective. During the interview, Sears denied participating in the robbery and denied acting as a getaway driver for the three men who broke into Brown's home. Sears admitted, however, that he had been in same area on the morning of March 8 to meet a girl and that while he was driving, someone had jumped into his truck.

As part of his investigation, the detective also interviewed Darrell Bendy. Bendy provided information to the detective about the statements Sears made to Bendy regarding Sear's involvement in the robbery. Additionally, the detective testified that during his investigation, he was told that Cormier sold drugs. He also testified that Sears is a known drug dealer who was known to rob other dealers. The detective stated that based on his investigation, he came to the conclusion that Sears was a party to the robbery of Brown's house. He testified, however, that he was not able to sufficiently identify the other three assailants who broke into Brown's home. He testified that he had no reason to suspect that Cormier was involved in the robbery.

At trial, the State also introduced audio recordings of three telephone calls. A sergeant with the Jefferson County Correctional Facility testified that the calls were made by Sears while he was incarcerated in the Jefferson County jail. All three audio recordings were admitted into evidence and played for the jury. In all three recordings, the caller is a male who identifies himself as "Sauce." The detective who investigated the robbery testified at trial that Sears goes by the nickname, "Hot [S]auce."

In the first recording, Sauce calls a female named Sharika, who uses a separate telephone to call a person referred to as Sauce's younger brother, Donovan. At the

15

beginning of the call, Sharika acts as an intermediary between Sauce and Donovan,

relaying information between the two. During this portion of the call, the following

conversation can be heard:

Sharika:    Hello? Donovan? What you want me to tell him, Sauce?
Sauce:      Man, tell that n----r I say what's up, man?
Sharika:    (Speaking to Donovan) He say, "What's up, man"?
Sharika:    (Speaking for Donovan) He say . . . he talk to K. Sauce?
Sauce:      Yeah? What did that n----r say?
Sharika:    (Speaking to Donovan) He say, "What that n----r said?"
Sharika:    (Speaking for Donovan) "The same thing I told you, Sauce."
Sauce:      Ask him—did he ask that n----r about that bitch, too?
Sharika:    (Speaking to Donovan) He say, "Did you ask him about the bitch, too?"
Sharika:    (Speaking for Donovan) "I told you, nobody ain't going to court."
Sauce:      Hey, ask Cuz . . . tell that n----r Cuz, if that n----r don't go when I go back, I'm bound to get . . . two year time served, Cuz. You know what I'm sayin'?
Sharika:    What happened? What you say, Donovan?
Sharika:    (Speaking for Donovan) "ET say he going to be with him to make sure that he don't go to court."
Sauce:      Who? TC?
Sharika:    (Speaking to Donovan) TC, you said?
Sharika:    (Speaking for Donovan) "ET."
Sauce:      Oh, ET. That's better. That's better. . . .

Later on in the call, Sharika holds the two telephones close to each other so that

Sauce can speak directly to Donovan. Although portions of the conversation between

Sauce and Donovan are unintelligible, the following conversation can be heard:

Sauce:      Hey, what's up, big buddy?
Donovan:    What's up, buds?

16

Sauce:        G-- d---, bitch. What been crackin'?

Donovan:    Man, I've just -- I've been working, bitch. . . .

Sauce:        What, um -- hey, you had talked to that n----r yourself?

Donovan:    Who?

Sauce:        K, bitch [unintelligible].

Donovan:    I said when I was there, he was on some scared sh-t. [unintelligible] He hang up the phone. His mama gave me his number [unintelligible] another number from Sharika. He hang up the phone in my face. The phone, n----r. I see ET going down, uh, in the gate. You know, the first time I got ET to holler at him, ET called the n----r in front of me. So, I slammed ET down. ET [unintelligible] and ET comes over [unintelligible]. He like . . . ET like, "Man, that n----r scared." He's like, . . . "I told Sauce from the first time that that n----r and that bitch ain't going nowhere towards a court." Man, he like, "Sauce is my kinfolk. I love Sauce. . . . Before I let another n----r take that kid down, I'm going to take that n----r down." I'm like, sh-t, I feel that. I saw ET last night. I listened to him last night.

Sauce:        Yeah. Yeah.

Donovan:    He was like, "Man, I swear, I bet on my life, on my kids, that n----r's not showing up to court, Cuz. And that's one thing he ain't going to do is come to court. And, like, that n----r don't want no beef. He don't want no . . . problems with nobody else. And, you know, if he shows up to court, that's what it's going to be."

In the second recording, Sauce calls a female whom he identifies in the call as his mother. His mother, in turn, refers to him as "Armaud." During the call, the following conversation can be heard:

Sauce:        I need you to call that n----r, Donovan.

Mother:      What you want me to tell him? I can go over there and tell him.

. . . .

17

Sauce: Look, man I need you -- man, don't forget because this is important.

Mother: I'm not. . . .

Sauce: I don't really . . . want to say too much on the phone --

Mother: I know, I know.

Sauce: --so don't . . . repeat nothing I say. Just tell him exactly like I tell you. Tell that n----r, Donovan, . . . tell him that I'm about to start my trial today. So tell him he need to call—you might need to write it down so you won't forget these names.

Mother: Hold on, hold on. I need to get a—I got a pen. Let me get a piece of paper.

. . . . .

Mother: Okay. Name?

Sauce: Tell him to tell--tell him he need to get in touch with ET--

Mother: ET. Mm-hmm.

Sauce: --and tell him to, uh, tell ET to get at that n----r.

Mother: Mm-hmm.

Sauce: Tell him, uh--

Mother: Okay. I got you.

Sauce: Alright, look. Tell ET to get at that n----r today. And tell him that today and tomorrow . . . I'm going to be going to trial. Tell that n----r he need to make sure . . . that that little situation's straight.

Mother: Mm-hmm. Okay. I got you.

. . . .

Sauce: You be seeing Jay over there?

Mother: All the time. He asks about you all the time.

Sauce: You going to see him . . . today?

Mother: Uh-huh.

Sauce: Look, tell him . . . tell that n----r, look, alright, the same stuff I told you to tell Donovan--

Mother: Mm-hmm.

Sauce: --tell that n----r, Jay--

Mother: Mm-hmm.

18

| | |
|---|---|
| Sauce: | --that, uh, man, . . . just tell Jay that . . . he know that n----r, K? Right? You know what I'm saying? |
| Mother: | Mm-hmm. |
| Sauce: | And just tell him, like . . . tell him . . . |
| Mother: | I know what you want me to say. I got you. |
| Sauce: | Yeah, yeah, yeah. Tell him, uh-- |
| Mother: | I got it. You ain't got to say it. I got it. |
| . . . . | |
| Sauce: | Hey, don't forget, mom. Call him and get that n----r Jay's number. Call him and tell him what I said, too. |
| Mother: | I am. |
| Sauce: | Alright. |
| Mother: | Bye-bye. I love you. |
| Sauce: | Hey, hey, mom, tell Donovan to get right on that, man. Tell him we ain't got no time to waste. |

In the third recording, Sauce calls a female who is with someone named Bree.

During the call, the following conversation can be heard:

| | |
|---|---|
| Sauce: | Ask Bree if she still be talking to that ho or that n----r, K. |
| Female: | (Speaking to Bree) You still be talking to K, Bree? |
| Female: | (Speaking for Bree) She say, "Yeah, that's her man." |
| Sauce: | Ask her if Cuz, uh, if he still f---ing Laura. |
| Female: | If he still what? |
| Sauce: | If he still f---ing Laura. |
| Female: | Wait. Cora? |
| Sauce: | Put her on the phone. |

At this point in the call, Bree gets on the telephone and speaks directly to Sauce. The

following conversation then takes place:

| | |
|---|---|
| Bree: | Hello. |
| Sauce: | Hello? |
| Bree: | What's up? |
| Sauce: | What you say, Bree? |

Bree: What's up?

Sauce: Say, is Cuz still f---ing Laura?

Bree: Yeah.

Sauce: Hey, is that ho still staying in Beaumont or she moved?

Bree: She moved.

Sauce: Hey, that thing with you I asked—that you had talked with that n----r—that thing with, um—I had told you to ask—to ask that n----r that sh-t?

Bree: Yeah.

Sauce: What did he have to say?

Bree: He say he—about whoever broke into his house?

Sauce: No, ain't nobody break into his house. About when his house got ran in. I'm talking about with him and that ho going to court. That's what I'm talking about.

Bree: Oh. He said that he not going. He say the only reason he had to do that because he had insurance on [unintelligible] rock like that. He's like tell that n----r call my phone.

Sauce: Ask him what—man, did he say if that ho gonna go?

Bree: I'm pretty sure she ain't gonna go if he ain't gonna go. He—I'm about to call him.

Sauce: Yeah . . . hey, look, call that n----r. Tell that n----r, man . . . tell Cuz, man, all I got to do—I be rid of this case soon. Tell him they ain't got sh-t. . . . Tell him that when I get out, I got ten bands for him if he let me hit the streets.

Bree: He say he ain't worried about it about what he tell anyone. He's like done [unintelligible] said he wasn't going to court. He was like, tell him he ain't got to worry about that. . . . [unintelligible] tell you to call him.

. . . . .

Sauce: Hey, look, just whenever you talk with that n----r, tell that n----r, um, that I'm planning on . . . getting my little brother to go like . . . to pay my lawyer and sh-t. Next time he gotta go pay him, I'm going to get Cuz to, um, to get an affidavit to give it to you. Tell him to get that ho to sign that bitch for me, man.

Bree: Alright.

20

| Sauce: | You think he gonna do it? |
|--------|---------------------------|
| Bree:  | I'm sure. He probably is like I said. He said the only reason [he] had to do this is 'cause . . . he say he know you weren't the one who ran into his house – that you were just a driver or whatever, or some sh-t. |

At the close of the State's case-in-chief, Sears moved for an instructed verdict of not guilty. The trial court denied Sears's motion. Sears did not testify at trial or call any witnesses to testify on his behalf, and after closing arguments, the jury found Sears guilty of aggravated robbery as charged in the indictment. At the punishment phase of the trial, Sears pleaded "true" to three enhancement allegations, and after hearing additional evidence presented by the State, the jury assessed punishment at twenty-five years in prison and a $10,000 fine.[3] Sears timely filed this appeal.

## II.    Sufficiency of the Evidence

In his first issue, Sears challenges the sufficiency of the evidence to support his conviction for aggravated robbery. Specifically, Sears contends that the evidence is insufficient to show: (1) that he is criminally responsible as a party for the aggravating element of the offense; or (2) that he solicited, encouraged, directed, aided, or attempted to aid the primary actors to commit the aggravated robbery while acting with the specific intent to promote or assist the commission of the offense.

---

[3] The record reflects that Sears's punishment was assessed in accordance with the punishment range applicable to a first-degree felony enhanced by a prior felony conviction. *See* Tex. Penal Code Ann. § 12.42(c)(1) (West Supp. 2016).

## A.    Standard of Review

We review the sufficiency of the evidence to support a conviction under the standard set forth in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). *See Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010). Under that standard, we view all of the evidence in the light most favorable to the verdict and determine, based on that evidence and any reasonable inferences therefrom, whether any rational factfinder could have found the essential elements of the offense beyond a reasonable doubt. *Temple v. State*, 390 S.W.3d 341, 360 (Tex. Crim. App. 2013) (citing *Jackson*, 443 U.S. at 318–19). "The jury is the sole judge of credibility and weight to be attached to the testimony of the witnesses." *Id*. In this role, the jury may choose to believe all, some, or none of the testimony presented by the parties. *Chambers v. State*, 805 S.W.2d 459, 461 (Tex. Crim. App. 1991). Further, the jury is permitted to draw multiple reasonable inferences from facts as long as each is supported by the evidence presented at trial. *Temple*, 390 S.W.3d at 360. When the record supports conflicting inferences, we presume that the jury resolved those conflicts in favor of the verdict and therefore defer to that determination. *Id*.

In reviewing the sufficiency of the evidence, we consider all of the evidence in the record, regardless of whether it was properly admitted. *Clayton v. State*, 235

S.W.3d 772, 778 (Tex. Crim. App. 2007). Direct and circumstantial evidence are equally probative of an actor's guilt, and "'circumstantial evidence alone can be sufficient to establish guilt.'" *Temple*, 390 S.W.3d at 359 (quoting *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007)). In a circumstantial evidence case, each fact need not point directly and independently to the guilt of the defendant so long as the combined and cumulative force of all the incriminating circumstances warrants the conclusion that the defendant is guilty. *Id.* at 359–60 (quoting *Johnson v. State*, 871 S.W.2d 183, 186 (Tex. Crim. App. 1993)); *Hooper*, 214 S.W.3d at 13. "After giving proper deference to the factfinder's role, we will uphold the verdict unless a rational factfinder must have had reasonable doubt as to any essential element." *Laster v. State*, 275 S.W.3d 512, 518 (Tex. Crim. App. 2009).

The jury charge in the present case authorized the jury to convict Sears of aggravated robbery either as a principal or as a party. In a general verdict, the jury found Sears guilty of aggravated robbery. Because the evidence is insufficient to support Sears's conviction as a principal,[4] we address whether the evidence is sufficient to support his conviction under the law of parties.

---

[4] The State's theory from voir dire examination to its final argument was that Sears was the getaway driver for the men who robbed Brown's home and that Sears's guilt depended upon the law of parties. At trial, the undisputed evidence shows that Sears was driving a red Toyota Tundra pick-up truck in front of or in the vicinity of Brown's house when the robbery occurred. There was no evidence that Sears was

## B.	Applicable Law

A person commits robbery if, in the course of committing theft and with intent to obtain or maintain control of the property, he intentionally or knowingly threatens or places another in fear of imminent bodily injury or death. Tex. Penal Code Ann. § 29.02(a)(2) (West 2011). A person commits aggravated robbery if he commits robbery and uses or exhibits a deadly weapon. *Id*. § 29.03(a)(2) (West 2011). A firearm is a deadly weapon per se. *Id*. § 1.07(a)(17)(A) (West Supp. 2016); *Ex parte Huskins*, 176 S.W.3d 818, 820 (Tex. Crim. App. 2005). Here, the indictment alleged, and the State was required to prove, that Sears, "while in the course of committing theft of property owned by [LAURA BROWN] . . . and with intent to obtain and maintain control of said property, intentionally and knowingly threaten[ed] and place[d] [Brown] in fear of imminent bodily injury and death, by using and exhibiting a deadly weapon, to-wit: a firearm[.]"

"A person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally

---

one of the three masked men who entered Brown's home. There was also no evidence that Sears personally threatened or placed Brown in fear of imminent bodily injury or death while in the course of committing a theft or that Sears personally used or exhibited a deadly weapon at any time. On appeal, the State does not argue that any evidence exists to support Sears's conviction on a theory of principal liability.

24

responsible, or by both." Tex. Penal Code Ann. § 7.01(a) (West 2011). "A person is criminally responsible for an offense committed by the conduct of another if . . . , acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense[.]" *Id.* § 7.02(a)(2).

## C.    Sufficiency of the Evidence to Support the Aggravating Element of the Offense

Sears argues that there is insufficient evidence to show that he is criminally responsible as a party for the aggravating element of the offense—i.e., the use or exhibition of a deadly weapon. "A conviction for an aggravated offense must be supported by evidence that the defendant committed, or was criminally responsible for committing, the aggravating element." *Wyatt v. State*, 367 S.W.3d 337, 340–41 (Tex. App.—Houston [14th Dist.] 2012, pet. dism'd) (citing *Stephens v. State*, 717 S.W.2d 338, 340 (Tex. Crim. App. 1986)). In an aggravated robbery case in which the aggravating element is the use or exhibition of a deadly weapon, the defendant may only be held criminally responsible for the aggravating element under a theory of party liability if the State proves beyond a reasonable doubt that the defendant knew a deadly weapon would be used in the course of committing the robbery. *Jackson v. State*, 487 S.W.3d 648, 656 (Tex. App.—Texarkana 2016, no pet.); *Adkins v. State*, 274 S.W.3d 870, 875 (Tex. App.—Fort Worth 2008, no pet.);

25

*Rodriguez v. State*, 129 S.W.3d 551, 563 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd). Specifically, "'there must be direct or circumstantial evidence that [the defendant] not only participated in the robbery before, while, or after a [deadly weapon] was displayed, but did so while being aware that the [deadly weapon] would be, was being, or had been, used or exhibited during the offense.'" *Wyatt*, 367 S.W.3d at 341 (quoting *Anderson v. State*, No. 14-00-00810-CR, 2001 WL 1426676, at *1 (Tex. App.—Houston [14th Dist.] Nov. 15, 2001, pet. ref'd) (not designated for publication)). "Otherwise, 'the evidence necessary to convict [the defendant] as a party to aggravated robbery would be no different than that to convict him as a party to (ordinary) robbery, *i.e.*, mere participation in the robbery.'" *Id.* (quoting *Kanneh v. State*, No. 14-00-00031-CR, 2001 WL 931629, at *2 (Tex. App.—Houston [14th Dist.] Aug. 16, 2001, pet. ref'd) (not designated for publication)).

We agree with Sears that even if the jury believed that Sears participated in the robbery as the getaway driver for the three men who committed the robbery inside Brown's home, the record contains no evidence that Sears was aware that any firearm or other deadly weapon would be, was being, or had been used or exhibited during the offense. *See Wyatt*, 367 S.W.3d at 341. The record contains no evidence that the three masked men exhibited or otherwise made Sears aware of their firearms at any time before they entered Brown's house. The record also contains no evidence

26

that Sears became aware that firearms were being used or exhibited by the three men inside the house while the robbery was in progress. The undisputed evidence presented at trial shows that while the masked men were committing the robbery inside Brown's home, Sears was in a red Toyota Tundra in front of or in the vicinity of Brown's house. There is no evidence that Sears entered Brown's house at any time while the robbery was being committed. The jury heard testimony that Kadrian Cormier escaped through a bathroom window during the robbery and flagged down a vehicle, which happened to be the red Toyota Tundra that Sears was driving. Although there is evidence that Cormier tried to explain to Sears "what was going on and that he needed to call to the police to get help," there is no evidence that Cormier told Sears that the intruders inside the house had guns or other weapons. Further, there was no evidence that Sears could see into the home through the windows or otherwise to see what was happening inside.

The record also contains no evidence to show that after the robbery, Sears became aware that the masked men had used or exhibited firearms during the commission of the offense. While there is evidence that a witness saw three men in dark clothing emerge from a ditch close to Brown's house and jump into a red truck bearing the same license plate as the truck that Cormier had seen Sears driving several minutes earlier, the witness testified that he could not see if the men had

27

anything in their hands. Thus, even if the jury reasonably believed that the three men the witness saw getting into the truck were the same men who had robbed Brown and that Sears was the one who was driving the red truck when the three men jumped into it, the witness's testimony does not establish that the three men were visibly displaying any firearms when they got into the truck or that after getting into the truck, they showed Sears their firearms or made Sears aware that they had used or exhibited firearms during the commission of the robbery. Further, when Sears was arrested two days after the robbery driving the same red truck, there is no evidence that any firearms were located inside the truck.

In its brief on appeal, the State has not pointed to any evidence in the record that Sears knew that a firearm or other deadly weapon would be used during the commission of the robbery, and we have found none in our review of the evidence presented at trial. "'Although it would intuitively seem likely'" that Sears knew or saw the three men's guns before or after the robbery, "'without at least circumstantial evidence to support it, such a conclusion cannot properly be based on speculation or assumption.'" *Wyatt*, 367 S.W.3d at 343 (quoting *Kanneh*, 2001 WL 931629, at *3). We therefore sustain Sears's first issue to the extent he argues that the evidence is insufficient to show that he is criminally responsible as a party for the aggravating element of the offense.

## D. Reformation of the Judgment

Having concluded that the evidence is insufficient to establish that Sears is criminally responsible under a theory of party liability for the aggravating element of his aggravated robbery conviction, it follows that the evidence is insufficient to support a finding that Sears is guilty of aggravated robbery. *See Lockett v. State*, 874 S.W.2d 810, 818 (Tex. App.—Dallas 1994, pet. ref'd). However, under the indictment in this case, robbery is a lesser-included offense of aggravated robbery, the difference between the two being only the use or exhibition of a deadly weapon. *See* Tex. Penal Code Ann. §§ 29.02(a)(2), 29.03(a)(2); *Penaloza v. State*, 349 S.W.3d 709, 711 (Tex. App.—Houston [14th Dist.] 2011, pet. ref'd). Under certain circumstances, courts of appeals should reform the judgment to reflect a conviction for a lesser-included offense when the evidence is insufficient to show that the defendant is guilty of the greater offense for which he was convicted. *See Thornton v. State*, 425 S.W.3d 289, 299–300 (Tex. Crim. App. 2014). To determine if we must reform the judgment in such a manner, we must ask two questions: (1) whether, in the course of convicting Sears for aggravated robbery, the jury must have necessarily found every element necessary to convict Sears for the lesser-included offense of robbery; and (2) whether there is sufficient evidence to support a conviction for robbery. *See id*. If the answer to both of these questions is yes, then we are "required

29

. . . to avoid the 'unjust' result of an outright acquittal by reforming the judgment to reflect a conviction for the lesser-included offense." *Id*. at 300.

First, as noted, the elements of robbery and aggravated robbery, as they relate to this case, are the same except that aggravated robbery requires an additional finding that the defendant used or exhibited a deadly weapon. *See* Tex. Penal Code Ann. §§ 29.02(a)(2), 29.03(a)(2). Therefore, when the jury found Sears guilty of aggravated robbery as charged in the indictment, it necessarily found him guilty of the lesser-included offense of robbery. *See Lucero v. State*, 915 S.W.2d 612, 615 (Tex. App.—El Paso 1996, pet. ref'd); *Hester v. State*, 909 S.W.2d 174, 181 (Tex. App.—Dallas 1995, no pet.).

Second, we examine whether the evidence is sufficient to prove that Sears is guilty of the lesser-included offense of robbery. *See Thornton*, 425 S.W.3d at 300. When, as here, the evidence shows that the defendant was not a primary actor, but is at most responsible as a party for the actions of the primary actor, the State "must prove conduct constituting an offense[,] plus an act by the defendant done with the intent to promote or assist such conduct." *Beier v. State*, 687 S.W.2d 2, 3 (Tex. Crim. App. 1985). To prove the requisite intent to promote or assist the commission of the offense, "[t]here must be sufficient evidence of an understanding and common design to commit the offense." *Gross v. State*, 380 S.W.3d 181, 186 (Tex. Crim.

30

App. 2012). In other words, the evidence "must show that at the time of the commission of the offense[,] the parties were acting together, each doing some part of the execution of the common purpose." *Brooks v. State*, 580 S.W.2d 825, 831 (Tex. Crim. App. [Panel Op.] 1979). Whether an accused participated as a party to an offense may be determined by examining the events occurring before, during, and after the commission of the offense and by the actions of the accused that show an understanding and common design to commit the offense. *Gross*, 380 S.W.3d at 186. Circumstantial evidence may be used to prove that the accused was a party to the offense. *Id*. The "mere presence of a person at the scene of a crime, or even flight from the scene, without more, is insufficient to support a conviction as a party to the offense." *Id*. Similarly, proof that an accused assisted the primary actor in making his getaway, standing alone, is also insufficient to prove liability as a party, even if the accused's conduct may constitute the independent offense of hindering apprehension or prosecution. *See Urtado v. State*, 605 S.W.2d 907, 911-12 (Tex. Crim. App. [Panel Op.] 1980); *Wooden v. State*, 101 S.W.3d 542, 546 (Tex. App.— Fort Worth 2003, pet. ref'd). However, evidence that the defendant was present at the scene or assisted the primary actor in making his getaway may combine with other facts to show that the accused was a participant in the offense. *See Thompson v. State*, 697 S.W.2d 413, 417 (Tex. Crim. App. 1985), *superseded by statute on*

31

*other grounds as stated in Cook v. State*, 902 S.W.2d 471, 476 (Tex. Crim. App. 1995); *Guillory v. State*, 877 S.W.2d 71, 74–75 (Tex. App.—Houston [1st Dist.] 1994, pet. ref'd).

In his brief, Sears does not challenge the sufficiency of the evidence to show that the three men who entered Brown's home, held her at gunpoint, and stole her money and jewelry committed the offense of robbery (and the greater offense of aggravated robbery). Instead, Sears argues, as we understand it, that there is no evidence: (1) that he committed an act that solicited, encouraged, directed, aided, or attempted to aid the three masked men to commit the robbery; or (2) that he committed such an act with the intent to promote or assist the commission of the robbery. *See* Tex. Penal Code Ann. § 7.02(a)(2). Sears argues that the evidence, at most, shows only that he was "in the area" in a red Toyota Tundra when the robbery was committed and that "three men were later seen coming out of a ditch and entering into [the] same vehicle that Sears was previously identified as driving." He contends that this evidence is insufficient to establish his guilt as a party to the robbery because the three men who were seen getting into the red truck were never identified, there is no evidence that they were involved in the robbery at Brown's house, and there is no evidence that Sears was driving the red truck when the three men jumped into it. We disagree.

First, the jury heard evidence from which it could reasonably infer that Sears committed acts that aided in the commission of the robbery. Although Kadrian Cormier did not testify at trial, the jury heard testimony from two witnesses—the detective and one of the officers who responded to the robbery—who testified that they spoke to Cormier after the robbery occurred. According to their testimony, Cormier told them that when the three men entered Brown's house, he escaped through a bathroom window and flagged down a red Toyota Tundra pick-up truck that he saw "in front of the house" or "near . . . Brown['s] driveway." Cormier later identified Sears as the driver of the truck in a photo lineup. Once inside the truck, Cormier explained to Sears "what was going on and that he needed to call the police to get help." Sears, however, refused to let Cormier use his cell phone to report the crime. When Cormier began to suspect that "something wasn't right" and that Sears might be involved in the robbery, he told Sears that he wanted to get out of the truck. However, Sears responded, "I bet you do, mother f----r[,]" and refused to let Cormier leave, then drove the truck out of Brown's neighborhood with Cormier still in the vehicle. Cormier stated that he ultimately had to jump out of the truck to escape. After jumping out of the truck, Cormier was able to obtain the truck's license plate number, which he later reported to the police. When Cormier returned to Brown's house a short time later, Brown called 911 to report the robbery, and both Brown

and Cormier spoke to the 911 operator. Based on the timing of that 911 call, Cormier's encounter with Sears occurred a short time before 6:09 a.m.

The jury also heard testimony from another witness, who testified that he observed a red truck traveling north on Dowlen Road on the morning of the robbery. That witness testified that the truck caught his attention because it stopped short of the intersection it was approaching and began driving in reverse. The truck backed up until it came to a drainage ditch. There was testimony that the drainage ditch ran behind the street on which Brown's house was located. The witness testified that when the truck reached the ditch, he observed three men in dark clothing come running out of the ditch and get into the truck. The witness's description of the three men who emerged from the ditch was consistent with the description of the robbers provided by Brown, who testified that three men who broke into her house were wearing dark clothing. The witness testified that once the three men got into the truck, he was able to see the truck's license plate number as it drove away, and he called 911 to report the truck's activities and its license plate number. The evidence shows that the witness called 911 at approximately 6:01 a.m.

The detective who investigated the robbery testified that the license plate number reported by the witness was the same license plate number identified by Cormier as belonging to the red Toyota Tundra that he had flagged down in front of

34

Brown's house while the robbery was in progress. Further, the detective testified that through his investigation, he learned that the license plate number reported by the witness and Cormier was registered to a vehicle that had been rented to Crystal Foxall. At trial, Foxall admitted that she rented a red Toyota Tundra for Sears in February or March of 2013. The detective testified that Sears was arrested two days after the robbery driving a red Toyota Tundra with the same license plate number as the one reported by the witness and Cormier. During a subsequent interview with police, Sears admitted that he was "in the area" in the red Toyota Tundra at the time of the robbery and that someone had jumped into his vehicle that morning, but he denied any participation in the robbery. Finally, the jury heard telephone calls from the jail allegedly made by Sears speaking with others about the crime and the actors involved.

Viewing the evidence in the light most favorable to the verdict, we conclude that the jury could have reasonably inferred that Sears was the driver of the red Toyota Tundra that Cormier flagged down in front of Brown's house while the robbery was in progress; that Sears was driving the same red Toyota Tundra a short time later when the witness observed it on Dowlen Road picking up three men who ran out of a drainage ditch; and that the three men who ran out of the drainage ditch were the same three men who had robbed Brown at gunpoint. *See Hooper*, 214

35

S.W.3d at 15–16 (noting that juries may "draw multiple reasonable inferences as long as each inference is supported by the evidence presented at trial" and explaining that "an inference is a conclusion reached by considering other facts and deducing a logical consequence from them"). Accordingly, we conclude that the jury could have reasonably inferred from the evidence that Sears committed acts that aided in the commission of the robbery by: (1) taking steps to prevent Cormier from calling the police to report the robbery; and (2) serving as the getaway driver for the men who committed the robbery in Brown's home. *See* Tex. Penal Code Ann. § 7.02(a)(2).

We also conclude that there was evidence from which the jury could have reasonably inferred that Sears committed these acts with the intent to promote or assist the commission of the robbery. *See id.* Brown testified that when the three men broke into her house, one of the men grabbed her and asked, "Do you know where he is?" Another one of the men then searched the house to see if anyone else was present. There was also testimony that one of the intruders asked, "Where's the money?" and when one of the intruders looked under Brown's bed, the man said, "[L]ook, it's right here, it's right here." Further, as already noted, the evidence shows that at the time the three masked men broke into Brown's house, Sears was outside in a red Toyota Tundra in front of Brown's house. When Cormier flagged down Sears's truck to ask for help, Sears refused to let Cormier use his cell phone to report

36

the robbery. When Cormier began to suspect that Sears might also be involved in the robbery, Cormier told Sears that he wanted to get out of the truck, but Sears refused, stating, "I bet you do, mother f----r." Sears then drove out of the neighborhood with Cormier still in the truck, and Cormier eventually had to jump out of the vehicle to escape. The evidence shows that the same red Toyota Tundra was seen a short time later stopping on Dowlen Road, backing up to a drainage ditch that ran behind Brown's house, picking up three men who matched the description of the men who broke into Brown's house, and driving away.

Additionally, although Darrell Bendy testified that he could not recall making a statement to law enforcement concerning Sears's involvement in the robbery, the detective testified, without objection, that Darrell Bendy reported to him information about Sears's admitted involvement in the robbery. The State also presented testimony from the detective that Sears is a known drug dealer who targets other dealers, and there was at least some evidence that Cormier is also a drug dealer. Finally, the State presented recordings of telephone calls that Sears made while incarcerated in the county jail, in which Sears discussed plans with various family members and acquaintances to keep someone named "K" from showing up at trial. Based on the content of the recorded calls and the fact that Cormier was a primary witness against Sears but did not testify at trial, the jury could have reasonably

37

inferred that "K" was Kadrian Cormier. Evidence of attempts by the defendant to suppress testimony of a witness is probative of a consciousness of guilt. *Hedrick v. State*, 473 S.W.3d 824, 830 (Tex. App.—Houston [14th Dist.] 2015, no pet.); *Roberts v. State*, 795 S.W.2d 842, 845 (Tex. App.—Beaumont 1990, no pet.).

Based on the foregoing evidence, the jury could have reasonably inferred that at the time the robbery occurred, Sears and the three masked men had a common plan to commit the robbery at Brown's house; that Sears was waiting in his truck for the three men to come out of Brown's house when Cormier flagged down his vehicle; that when Cormier got into Sears's truck, Sears recognized Cormier as one of the intended victims of the robbery and took steps to prevent him from contacting the police; and that after Cormier escaped from the truck, Sears returned to an area near Brown's house, picked up the three robbers in his truck, and helped them make their getaway from the crime scene. *See Gross*, 380 S.W.3d at 186 (explaining that a reviewing court may look to events occurring before, during, and after the commission of the offense and may rely on circumstantial evidence to determine whether the evidence is sufficient to show that the defendant was a party to the offense); *Hooper*, 214 S.W.3d at 15-16. Therefore, the jury could have reasonably inferred that Sears acted with the intent to promote or assist the commission of the robbery. *See* Tex. Penal Code Ann. § 7.02(a)(2).

38

Viewing the evidence in the light most favorable to the verdict, we conclude that the evidence is legally sufficient to support Sears's guilt as a party to the lesser-included offense of robbery. *See Jackson*, 443 U.S. at 319; *Temple*, 390 S.W.3d at 360. Because we have answered both questions under the *Thornton* analysis affirmatively, we reform the judgment to reflect a conviction for the lesser-included offense of robbery. *See* Tex. Penal Code Ann. § 29.02(a)(2); *Thornton*, 425 S.W.3d at 299-300.

### III.    Accomplice Witness Testimony

In his fourth issue, Sears argues that the evidence is insufficient to support his conviction for aggravated robbery because Cormier was an accomplice witness and the State failed to sufficiently corroborate Cormier's statements with other evidence at trial. Sears argues that because Cormier's statements to law enforcement agents constitute the only evidence tending to show that he was the driver of the red Toyota Tundra at the time of the robbery and those statements were uncorroborated at trial, there is legally insufficient evidence to support his conviction.

Article 38.14 of the Texas Code of Criminal Procedure provides that "[a] conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense."

Tex. Code Crim. Proc. Ann. art. 38.14 (West 2005). An accomplice is a person who participates in the offense before, during, or after its commission and acts with the required culpable mental state. *Druery v. State*, 225 S.W.3d 491, 498 (Tex. Crim. App. 2007). "Participation requires an affirmative act that promotes the commission of the offense with which the defendant is charged." *Cocke v. State*, 201 S.W.3d 744, 748 (Tex. Crim. App. 2006). Simply having knowledge of the offense and not disclosing that information, or even trying to conceal the information, does not render a witness an accomplice. *Id*. Additionally, mere presence at a crime scene does not make an individual an accomplice. *Id*. A person is an accomplice only if, under the evidence, he could have been charged with the same or a lesser-included offense as that with which the defendant was charged. *Zamora v. State*, 411 S.W.3d 504, 510 (Tex. Crim. App. 2013). Whether the person is actually charged and prosecuted for his participation is irrelevant to the determination of accomplice status; what matters is the evidence in the record. *Blake v. State*, 971 S.W.2d 451, 455 (Tex. Crim. App. 1998).

"When the evidence clearly shows (i.e., there is no doubt) that a witness is an accomplice as a matter of law, the trial judge must instruct the jury accordingly. *Smith v. State*, 332 S.W.3d 425, 439 (Tex. Crim. App. 2011). An instruction that a witness is an accomplice as a matter of law is appropriate, for example, "when the

witness is charged with the same offense as the defendant or a lesser-included offense or when the evidence clearly shows that the witness could have been so charged." *Druery*, 225 S.W.3d at 498. "When there is doubt as to whether a witness is an accomplice (i.e., the evidence is conflicting), then the trial judge may instruct the jury to determine a witness's status as a fact issue." *Smith*, 332 S.W.3d at 439–40. If the evidence clearly shows that a witness is not an accomplice, the trial judge is not required to instruct the jury on the accomplice witness rule as a matter of law or fact. *Id.* at 440.

In the present case, the trial court did not submit an instruction to the jury on Cormier's status as an accomplice witness as a matter of law or as a question of fact. Sears did not object to the jury charge on this basis, and he does not argue on appeal that the trial court should have given the jury either instruction. Nevertheless, Sears argues that Cormier was an accomplice because "[t]here was evidence to suggest that the aggravated robbery was an inside job done with the help of Cormier" and that Cormier's statements were therefore subject to the corroboration requirement set forth in article 38.14.

At trial, the second officer to testify on behalf of the State testified that when he spoke to Brown at the scene, she told him that at the time of the robbery, she, Cormier, and a female friend were the only people who knew that she had received

41

an income tax refund and that only she and Cormier knew where the money was located in her house. He testified that Brown also told him that when the intruders entered her home, they went straight to where the money was hidden, took the money, and left. According to the officer, Brown stated that it was as though the intruders knew exactly where the money was. The officer testified that these facts suggested to him at the time that the robbery was an inside job, meaning that someone who knew where the money was hidden had been working with the intruders. Further, the first officer to testify for the State explained that when he walked through Brown's house after the robbery, nothing in the house appeared to be disturbed except for a broken lamp and the broken door through which the robbers had entered the house. He testified that it did not appear as though the robbers had searched through the entire house. Sears argues that the foregoing testimony of the two police officers supports a finding that Cormier was an accomplice in the aggravated robbery. We disagree.

Neither the testimony of the two police officers, nor any other testimony presented at trial, establishes that Cormier participated in the commission of the aggravated robbery at any time while acting with the requisite culpable mental state. *See Druery*, 225 S.W.3d at 498. There is no evidence that Cormier told anyone, much less Sears or the intruders, about the existence of Brown's money or where it

42

was hidden before the aggravated robbery occurred. However, even if the evidence did support a finding that Cormier told the intruders about the money before the aggravated robbery occurred, there was no evidence that Cormier did so with the intent or knowledge that the intruders would use that information to rob Brown. There is also no evidence that Cormier engaged in any acts during or after the robbery that promoted the commission of the offense. To the contrary, the evidence shows that when the three masked men entered Brown's house, Cormier escaped through a bathroom window and flagged down two vehicles in an effort to contact the police. Although the evidence reflects that Sears, at least temporarily, prevented Cormier from contacting the police, Cormier ultimately did get in touch with the authorities shortly after the robbery was over and provided them with details about the intruders' getaway vehicle. Accordingly, there is no evidence to show that Cormier could have been charged with the same offense or a lesser-included offense as that with which Sears was charged. *See* Tex. Penal Code Ann. §§ 7.02(a)(2), 29.02, 29.03(a)(2); *Zamora*, 411 S.W.3d at 510. We therefore conclude that the evidence does not show that Cormier was an accomplice as a matter of law or as a matter of fact and that article 38.14 does not apply to Cormier's statements.

Further, the record reflects that Cormier did not testify at trial. Only in-court accomplice testimony is subject to article 38.14's corroboration requirement.

43

*Bingham v. State*, 913 S.W.2d 208, 210–11 (Tex. Crim. App. 1995) (op. on reh'g).

The State, therefore, was not required to offer evidence corroborating Cormier's out-of-court statements. We overrule Sears's fourth issue.

### IV. Admission of Recorded Telephone Calls

In his second issue, Sears challenges the trial court's admission of the recordings of the three telephone calls that Sears made while confined in the Jefferson County jail. He argues that the recordings were inadmissible because the State did not properly authenticate the recordings. He also argues that the recordings were inadmissible because their probative value was substantially outweighed by their prejudicial effect. We review a trial court's ruling on the admission of evidence for an abuse of discretion. *Casey v. State*, 215 S.W.3d 870, 879 (Tex. Crim. App. 2007). "A trial court abuses its discretion when its decision lies outside the zone of reasonable disagreement." *Id.*

### A. Authentication

The issue of authentication arises when "'the relevancy of any evidence depends upon its identity, source, or connection with a particular person, place, thing, or event.'" *Campbell v. State*, 382 S.W.3d 545, 548–49 (Tex. App.—Austin 2012, no pet.) (quoting *Shea v. State*, 167 S.W.3d 98, 104 (Tex. App.—Waco 2005, pet. ref'd)). "Evidence has no relevance if it is not authentically what its proponent

44

claims it to be." *Tienda v. State*, 358 S.W.3d 633, 638 (Tex. Crim. App. 2012). Rule 901(a) of the Texas Rules of Evidence provides that for a party to satisfy the requirement of authenticating or identifying an item of evidence, "the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Tex. R. Evid. 901(a). Whether the proponent of evidence has satisfied this threshold requirement is a preliminary question of admissibility to be decided by the trial court. Tex. R. Evid. 104(a); *Tienda*, 358 S.W.3d at 638. Rule 901, however, "'does not erect a particularly high hurdle, and that hurdle may be cleared by circumstantial evidence.'" *Campbell*, 382 S.W.3d at 549 (quoting Peter T. Hoffman, TEXAS RULES OF EVIDENCE HANDBOOK, Article IX at p. 948 (8th ed. 2008-09)). "The proponent of [the] evidence does not need to 'rule out all possibilities inconsistent with authenticity, or to prove beyond any doubt that the evidence is what it purports to be.'" *Id*. In fact, in performing its gate-keeping function under Rule 104(a), "the trial court itself need not be persuaded that the proffered evidence is authentic." *Tienda*, 358 S.W.3d at 638. Rather, the ultimate question of whether an item of evidence is what its proponent claims it to be is a question for the factfinder. *Id*. In a jury trial, "[t]he preliminary question for the trial court to decide is simply whether the proponent of the evidence has supplied facts

that are sufficient to support a reasonable jury determination that the evidence he has proffered is authentic." *Id.*

Rule 901(b) provides a nonexclusive list of methods for authenticating evidence. Tex. R. Evid. 901(b). Relevant to the present case are the following:

> (1) *Testimony of a Witness with Knowledge*. Testimony that an item is what it is claimed to be.
>
> . . . .
>
> (5) *Opinion About a Voice*. An opinion identifying a person's voice—whether heard firsthand or through mechanical or electronic transmission or recording—based on hearing the voice at any time under circumstances that connect it with the alleged speaker.

Tex. R. Evid. 901(b). "The trial judge does not abuse his or her discretion in admitting evidence where he or she reasonably believes that a reasonable juror could find that the evidence has been authenticated or identified." *Druery*, 225 S.W.3d at 502.

### 1. Authentication of the Recorded Telephone Calls at the Hearing on the State's Motion for a Finding of Forfeiture by Wrongdoing

Sears first argues that the trial court abused its discretion by admitting the recorded telephone calls into evidence at a hearing on the State's motion for a finding of forfeiture by wrongdoing. Prior to trial, the State filed a motion for a finding of forfeiture by wrongdoing, asserting that Sears had engaged in wrongful acts that

were intended to, and did, dissuade Cormier from testifying at trial. In the motion, the State sought a ruling from the trial court: (1) that Sears had forfeited his Sixth Amendment right to confront Cormier at trial under the doctrine of forfeiture by wrongdoing; and (2) that Cormier's testimonial, out-of-court statements to the police were therefore admissible at trial for purposes of the Confrontation Clause even if Cormier did not testify at trial and Sears had no prior opportunity to confront and cross-examine Cormier. After voir dire, but before opening arguments, the trial court held a hearing on the State's motion outside the presence of the jury. During the hearing, the State offered into evidence the three recorded telephone calls made by Sears while confined in the Jefferson County jail. Sears objected to the admission of the recordings on the ground that the State had failed to sufficiently identify Sears as the person who had made the calls. The trial court overruled Sears's objection, and the recordings were admitted into evidence for purposes of the hearing. On appeal, Sears contends that the trial court erred by admitting the recordings into evidence at the hearing because the recordings were not properly authenticated under Rule 901.

Rule 101 of the Texas Rules of Evidence provides that, with the exception of the rules governing privileges, the rules of evidence "do not apply to . . . the court's determination, under Rule 104(a), on a preliminary question of fact governing

admissibility[.]" Tex. R. Evid. 101(e)(1). Similarly, Rule 104 states: "The court must decide any preliminary question about whether . . . evidence is admissible. In so deciding, the court is not bound by evidence rules, except those on privilege." Tex. R. Evid. 104(a). The hearing on the State's motion for a finding of forfeiture by wrongdoing involved a determination under Rule 104(a) of preliminary questions concerning the admissibility of certain evidence—namely, the out-of-court statements made by Cormier to the police. *See Gonzalez v. State*, 195 S.W.3d 114, 125 n.47 (Tex. Crim. App. 2006) (noting with approval that "[s]everal pre- and post-*Crawford* cases have cited Rule 104(a) as the proper mechanism for the trial court to use in deciding whether the forfeiture [by wrongdoing] doctrine applies in a particular case"). Therefore, the rules of evidence, with the exception of privileges, did not apply during that hearing. *See* Tex. R. Evid. 101(e)(1), 104(a). Accordingly, we conclude that the trial court did not violate Rule 901 by admitting the recordings into evidence at the hearing on the State's motion for a finding of forfeiture by wrongdoing.

## 2. Authentication of the Recorded Telephone Calls at Trial

Sears next argues that the trial court erred by admitting the recorded telephone calls into evidence during the guilt-innocence phase of trial because the recordings were not properly authenticated under Rule 901. At trial, the State presented

testimony from a sergeant at the Jefferson County Correctional Facility to authenticate the three recorded telephone calls. The sergeant testified that she has responsibility over the facility's records department at the Jefferson County Correctional Facility. She explained that all telephone calls made by inmates at the facility are recorded and screened. The sergeant described how the telephone recording system works. She testified that to make a call, an inmate must enter his personal PIN number and use the system's voice recognition technology, which identifies the inmate by his voice. She explained that this method of identifying the inmate caller is used every time a call is made by an inmate at the facility. She testified that the system also informs the inmate that the call will be recorded.

The sergeant identified State's Exhibit 49 as the compact disc containing the recordings of the telephone calls made by Sears. She testified that she had listened to the recordings on the disc. She explained that the recordings were prepared by a device capable of making accurate recordings and that the operator was competent to operate the device. She also testified that the recordings on the disc were accurate representations of the conversations or statements that took place and did not appear to be altered in any way. The sergeant testified that she was familiar with Sears from passing through the jail and stated that she was able to identify Sears's voice in the recordings based on what she had heard.

In his brief, Sears contends that the State failed to properly authenticate the recorded telephone calls because there was no evidence that the sergeant had interviewed Sears or that she otherwise had personal knowledge of Sears's voice. We disagree. As noted, the sergeant testified at trial that she was familiar with Sears from passing through the jail and that she was able to identify Sears's voice in the recordings based on what she had heard. We conclude that this testimony sufficiently established the sergeant's personal familiarity with Sears's voice such that she was qualified to identify Sears as the caller in the recordings. *See* Tex. R. Evid. 901(b)(5).

Sears also argues that the calls were not sufficiently authenticated because no one from Global Telelinks, the contracting company that operates and maintains the phone system at the jail, testified regarding how the phone system is operated or that the system was working properly at the time the calls were made. In support of this argument, Sears cites to *Banargent v. State*, 228 S.W.3d 393 (Tex. App.—Houston [14th Dist.] 2007, pet. ref'd). In *Banargent*, the court concluded that recordings of telephone calls made by the defendant while incarcerated in county jail were properly authenticated where: (1) there was testimony from a sergeant with the sheriff's office that the proffered exhibit contained digital recordings of telephone calls made by the defendant; (2) a representative from the company that created the jail's telephone recording system testified about how the system worked, including

50

how the calls were stored, the types of prompts the system used to inform inmates that the calls were being recorded, and the types of safeguards the system employed to insure that the calls were accurately recorded; and (3) a witness with personal knowledge of the defendant's voice identified his voice in the recordings. 228 S.W.3d at 396, 401. While we agree that the court in *Banargent* relied, in part, on testimony from a representative of the company that created the jail's telephone recording system to conclude that the telephone recordings had been properly authenticated, we do not interpret *Banargent* or Rule 901 as requiring testimony from a company representative to properly authenticate such a recording. *See id.*; Tex. R. Evid. 901. In other words, while testimony from a representative of the company that created or that operates the jail's telephone recording system might be one way to properly authenticate the recording, it is not the only way. As long as there is sufficient evidence to support a finding that the recordings are what the State claims them to be, "there is no requirement for testimony from a representative of the company that operates the system for the county involved." *Chatman v. State*, No. 11-10-00044-CR, 2011 WL 3860437, *4 (Tex. App.—Eastland Aug. 31, 2011, no pet.) (mem. op., not designated for publication).

We also reject Sears's contention that there is no evidence that the jail's telephone recording system was working properly at the time the calls were made.

51

The sergeant testified that the recordings were made on a device capable of making accurate recordings and that the recordings were accurate representations of the conversations that took place. We conclude that this testimony could reasonably be interpreted to mean that the telephone recording system was working properly and accurately recorded the calls at the time the calls were made. Based on the record before us, the trial court could have reasonably concluded that the evidence presented was sufficient to support a reasonable jury determination that the evidence was what the State purported it to be—i.e., recordings of telephone calls made by Sears while confined in the Jefferson County jail. *See Tienda*, 358 S.W.3d at 638. We therefore conclude that the trial court did not abuse its discretion by overruling Sears's objection as to the authenticity of the recordings and by admitting the recordings into evidence at trial. *See* Tex. R. Evid. 901(b)(1), (5).

## B.     Admissibility of the Recorded Telephone Calls under Rule 403

Sears also argues that the trial court abused its discretion by admitting the recorded telephone calls into evidence at the hearing on the State's motion for a finding of forfeiture by wrongdoing and at trial because the nature of the calls was "highly prejudicial" and "the prejudicial effect far outweighed the probative value." We interpret Sears's argument as complaining that the recorded telephone calls were admitted in violation of Texas Rule of Evidence 403. Tex. R. Evid. 403 ("The court

may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice[.]"). As already noted, the rules of evidence, with the exception of privileges, did not apply during the hearing on the State's motion for a finding of forfeiture by wrongdoing.[5] *See* Tex. R. Evid. 101(e)(1), 104(a). Further, the record reflects that Sears did not object to the admission of the recorded telephone calls on the basis of Rule 403 during the hearing on the State's motion or at trial. The only objection that Sears made to the admission of the recorded telephone calls at the hearing or at trial was that the State did not properly authenticate the calls. Because Sears failed to object to the admission of the recorded calls under Rule 403, Sears did not preserve his Rule 403 complaint for our review.

---

[5] Sears contends that article 38.49 of the Texas Code of Criminal Procedure applied to the trial court's hearing on the State's motion for a finding of forfeiture by wrongdoing. Article 38.49 specifically states that "Rule 403, Texas Rules of Evidence, applies to this article." Tex. Code Crim. Proc. Ann. art. 38.49(f) (West Supp. 2016). However, article 38.49 was enacted by the Texas Legislature in 2013 and became effective on September 1, 2013. *See* Act of May 8, 2013, 83rd Leg., R.S., ch. 165, § 3, 2013 Tex. Sess. Law Serv. 716, 717-18 (West) (codified at Tex. Code Crim. Proc. Ann. art. 38.49 (West Supp. 2016)). The savings clause contained in the bill enacting article 38.49 provides, in relevant part, that "[t]he change in law made by this Act applies only to an offense committed on or after the effective date [Sept. 1, 2013] of this Act. An offense committed before the effective date of this Act is governed by the law in effect on the date the offense was committed, and the former law is continued in effect for that purpose." *See* Act of May 8, 2013, 2013 Tex. Sess. Law Serv. at 718. The offense for which Sears was convicted was committed on March 8, 2013, which was before the effective date of the enactment of article 38.49. Therefore, article 38.49 does not apply to this case.

*See* Tex. R. App. P. 33.1(a); *Williams v. State*, 191 S.W.3d 242, 255 (Tex. App.—Austin 2006, no pet.). We overrule Sears's second issue.

## V.    Sears's Right of Confrontation

In his third issue, Sears argues that the trial court abused its discretion by granting the State's pre-trial motion for a finding of forfeiture by wrongdoing and admitting the out-of-court statements of Kadrian Cormier into evidence at trial. Specifically, Sears contends that the State failed to prove that Sears engaged in any wrongful acts that were intended to, and did, procure Cormier's absence at trial, as required under the doctrine of forfeiture by wrongdoing. Sears argues that because the State failed to establish that the doctrine of forfeiture by wrongdoing applies in this case, the trial court's decision to admit Cormier's out-of-court testimonial statements at trial violated Sears's Sixth Amendment right of confrontation.

"A trial court's ruling admitting or excluding evidence is reviewed for an abuse of discretion." *Wood v. State*, 299 S.W.3d 200, 207 (Tex. App.—Austin 2009, pet. ref'd); *see also State v. Dixon*, 206 S.W.3d 587, 590 (Tex. Crim. App. 2006). "This means that the ruling will be upheld if it is reasonably supported by the record and is correct under any applicable legal theory." *Wood*, 299 S.W.3d at 207. The trial court is the sole trier of fact and judge of the credibility of the witnesses and the weight to be given their testimony. *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim.

App. 2000). We afford almost complete deference to the trial court's determination of historical facts, but we review *de novo* the trial court's application of the law to those facts. *Carmouche v. State*, 10 S.W.3d 323, 327 (Tex. Crim. App. 2000); *see also Wall v. State*, 184 S.W.3d 730, 742–43 & n.44 (Tex. Crim. App. 2006) (applying hybrid standard of review to *Crawford* issue); *Garcia v. State*, No. 03-11-00403-CR, 2012 WL 3795447, *10 (Tex. App.—Austin Aug. 29, 2012, pet. ref'd) (mem. op., not designated for publication) (applying hybrid standard of review in reviewing trial court's ruling admitting evidence under the doctrine of forfeiture by wrongdoing). If the trial court does not make findings of fact, we review the evidence in the light most favorable to the trial court's ruling and assume the trial court made findings that are supported by the record and that buttress its conclusion. *Carmouche*, 10 S.W.3d at 327–28.

The Confrontation Clause of the Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. CONST. amend. VI. This constitutional guarantee applies to both federal and state prosecutions. *Pointer v. Texas*, 380 U.S. 400, 406 (1965); *Woodall v. State*, 336 S.W.3d 634, 641 (Tex. Crim. App. 2011). The Confrontation Clause prohibits the admission of out-of-court testimonial statements made by a witness who did not appear at trial unless the

55

witness was unavailable to testify and the defendant had a prior opportunity to cross-examine the witness. *Crawford v. Washington*, 541 U.S. 36, 50-52, 59 (2004); *Woodall*, 336 S.W.3d at 642. However, the right of confrontation is not absolute, even when testimonial hearsay statements are at issue. *Davis v. Washington*, 547 U.S. 813, 833 (2006); *Gonzalez*, 195 S.W.3d at 117. The United States Supreme Court has recognized that testimonial hearsay statements may be admitted, even though the defendant has had no opportunity to confront the declarant, when the statements were made by a declarant whose unavailability was procured by the wrongdoing of the defendant. *Giles v. California*, 554 U.S. 353, 359 (2008); *Davis*, 547 U.S. at 833. This common-law exception to a defendant's right of confrontation is referred to as the doctrine of "forfeiture by wrongdoing." *Giles*, 554 U.S. at 359; *Davis*, 547 U.S. at 833.

Under the rule of forfeiture by wrongdoing, a defendant forfeits the right to confront a witness if he engages in wrongful conduct that is designed to prevent the witness from testifying. *Giles*, 554 U.S. at 359. "The doctrine is based on the principle that 'any tampering with a witness should once for all estop the tamperer from making any objection based on the results of his own chicanery.'" *Gonzalez*, 195 S.W.3d at 117 (quoting 5 John H. Wigmore, EVIDENCE, § 1406 at 219 (Chadbourn rev. 1974)). The doctrine has been widely used in cases in which a

56

defendant has "intimidated, bribed, or killed a witness to keep him from testifying about a prior crime[.]" *Id.* at 118, 125-26; *see also Sohail v. State*, 264 S.W.3d 251, 259 (Tex. App.—Houston [1st Dist.] 2008, pet. ref'd). For the forfeiture-by-wrongdoing exception to apply, there must be a showing: (1) that the defendant's act of misconduct resulted in the declarant's unavailability; and (2) that the defendant's actions were undertaken for the purpose of preventing the witness from testifying at trial. *Giles*, 554 U.S. at 359-60; *Gonzalez*, 195 S.W.3d at 120; *see also Render v. State*, 347 S.W.3d 905, 918 (Tex. App.—Eastland 2011, pet. ref'd); *Davis v. State*, 268 S.W.3d 683, 706 (Tex. App.—Fort Worth 2008, pet. ref'd). When applicable, the exception "extinguishes [a defendant's] confrontation claim[] on essentially equitable grounds[.]"[6] *Crawford*, 541 U.S. at 62; *see also Davis*, 547 U.S. at 833.

As noted, the State filed a pre-trial motion for a finding of forfeiture by wrongdoing, asserting that Sears had engaged in wrongful acts that were intended to, and did, procure Cormier's absence at trial. During the hearing on the State's motion, the State presented the testimony of four witnesses. Two of those witnesses—the police officer who spoke to Cormier at the scene and the detective

---

[6] As already noted, article 38.49 of the Texas Code of Criminal Procedure does not apply to this case.

who later interviewed Cormier—testified regarding the out-of-court statements that Cormier made to them after the robbery, including Cormier's statements regarding his encounter with the driver of the red Toyota pick-up truck, Cormier's identification of the truck's license plate number, and Cormier's positive identification of Sears as the driver of the red Toyota pick-up truck in a photo line-up prepared by police.

During the hearing, the trial court also heard testimony from the sergeant with the Jefferson County Correctional Facility whom the State later presented at trial to authenticate the recorded telephone calls that Sears made while confined in the Jefferson County jail. The sergeant's testimony was similar to that which she provided at trial. During the hearing, the sergeant testified that at the Jefferson County Correctional Facility, all telephone calls made by inmates are recorded by the county and screened. She specifically described how the telephone recording system works. She explained that to make a telephone call, inmates are required to enter their personal PIN number and use the system's voice recognition technology. She testified that this is a requirement that is followed every time an inmate uses the telephone. She testified that the system also informs the inmate that the call will be recorded. The sergeant identified State's Exhibit 6 as the compact disc containing

58

recordings of telephone calls made by Sears.[7] She explained that the recordings were prepared on a device capable of making accurate recordings and that the operator was competent to operate the device. She testified that she had listened to the recordings on the disc, that the recordings are accurate representations of any conversations or statements that took place, and that they did not appear to be altered in any way. She testified that she was able to identify Sears's voice on the recordings.

During the hearing, defense counsel took the sergeant on voir dire. During the voir dire examination, the sergeant testified that in each of the recordings, and before each telephone call is made, Sears states his name in response to a prompt by the system, the system's voice-recognition technology recognizes Sears's voice, and the system then permits the call to be made. She further testified that the system recorded the telephone number that Sears called in each recording.

During the sergeant's testimony, the State offered into evidence the three recorded telephone calls that Sears made while incarcerated in the Jefferson County jail, and the recordings were admitted into evidence for purposes of the hearing. As noted, in all three recordings, the caller is a male who identifies himself as "Sauce." In the first call, Sauce speaks to a male, who is identified in the recording as his

---

[7] The record reflects State's Exhibit 6, which was admitted at the hearing on the State's motion for a finding of forfeiture by wrongdoing, is identical to State's Exhibit 49, which was admitted at trial.

brother, Donovan. During the call, Donovan tells Sauce that he spoke to "K." Sauce asks Donovan what K said, and Donovan responds, "The same thing I told you, Sauce." Sauce then asks Donovan if he asked K "about that bitch, too[,]" and Donovan responds, "I told you, nobody ain't going to court." Donovan states, "ET say he going to be with him to make sure that he don't go to court." Sauce then asks Donovan to clarify if he had said "TC," and Donovan says, "ET." Sauce then states, "Oh, ET. That's better. That's better[.]"Later in the conversation, Donovan tells Sauce that ET had said, "'I told Sauce from the first time that that n----r and that bitch ain't going nowhere towards a court.'" He also states that ET said, "'Sauce is my kinfolk. I love Sauce. . . . Before I let another n----r take that kid down, I'm going to take that n----r down.'" Further, he states that ET said, "'I swear, I bet on my life, on my kids, that n----r's not show up to court . . . . [T]hat n----r don't want no . . . problems with nobody else. And . . . if he shows up to court, that's what it's going to be.'"

In the second recording, Sauce calls a woman, whom he identifies during the call as his mother. His mother refers to him in the call as "Armaud." During the call, Sauce tells his mother that he is going to trial that day and the next day and asks his mother to call Donovan. Sauce tells his mother to tell Donovan to "get in touch with ET" and to "tell ET to get at that n----r." Sauce emphasizes that ET needs to do this

60

"today." Sauce tells his mother to tell Donovan that "he need[s] to make sure . . . that that little situation's straight." Later in the conversation, Sauce tells his mother to also ask someone named Jay if "he know that n----r, K" and to tell Jay "the same stuff [he] told [her] to tell Donovan[.]"

Finally, in the third recording, Sauce speaks to two different females, the second of which is named Bree. Sauce asks the first female to ask Bree if she was still talking to "that ho" or "that n----r, K." According to the first female, Bree responds affirmatively, and Sauce asks the first female to ask Bree "if Cuz . . . is still f---ing Laura." Bree then gets on the telephone and speaks directly to Sauce. Sauce again asks if "Cuz" is "still f---ing Laura[,]" and Bree responds, "Yeah." Sauce then asks Bree if she had "talked with that n----r" about "that thing . . . I had told you to ask[.]" asks, "[A]bout whoever broke into his house?" and Sauce responds, "No, . . . [a]bout when his house got ran in. I'm talking about with him and that ho going to court. That's what I'm talking about." Bree then states, "Oh. He said he not going." Sauce asks, "[D]id he say if that ho gonna go?" and Bree responds, "I'm pretty sure she ain't gonna go if he ain't gonna go[,]" and states that she is "about to call him." Sauce then says, "[H]ey, look, call that n----r. . . . Tell him they ain't got sh-t. . . . Tell him that when I get out, I got ten bands for him if he let me hit the streets." Later in the conversation, Sauce tells Bree, "Hey, look, just whenever you talk with that

61

n----r, tell that n----r . . . that I'm planning on . . . getting my little brother to go . . . to pay my lawyer and sh-t. Next time he gotta go pay him, I'm going to get Cuz to . . . get an affidavit to give it to you. Tell him to get that ho to sign that bitch for me, man." Bree responds, "Alright." Sauce then asks Bree if she thinks he will do it, and Bree says, "I'm sure. He probably is like I said. He said the only reason [he] had to do this is 'cause . . . he say he know you weren't the one who ran into his house— that you were just a driver or whatever[.]"

The trial court also heard testimony from an investigator with the Jefferson County District Attorney's office, who testified that he has heard that Kadrian Cormier goes by the nickname, "K[.]" He testified that he had participated in efforts to secure Cormier as a witness in the State's prosecution of Sears. He explained that prior to trial, he went to Cormier's mother's house several times to talk to Cormier. While there, he spoke to Cormier's mother on several of these occasions, but she told him each time that Cormier was out of town. A week before trial, the investigator returned to Cormier's house and spoke to Cormier's aunt, who told him that Cormier was in Beaumont and driving a blue car. The aunt also gave him a cell phone number for Cormier. The investigator testified that although he was able to use this number to get in touch with Cormier, Cormier would always tell him that he was on his way to Austin, Houston, or some other location. According to the

investigator, Cormier would say that he would be in Beaumont on certain days at certain times, but then would not show up. The investigator made attempts to find Cormier at other locations, such as at Cormier's friends' houses, but was unsuccessful. According to the investigator, Cormier seemed very hesitant to testify and made excuses for not coming in, such as stating that he had to go do something for his kids or that he was taking his girlfriend to the doctor. The investigator testified that although he did everything he could, he was never able to meet with Cormier or serve him with a subpoena to appear at trial. On cross-examination, the investigator testified that Cormier never expressly told him that he had been threatened by anyone. The investigator also testified that he has heard that Cormier is a drug dealer and agreed that that might possibly be a reason why Cormier did not want to testify at trial.

At the conclusion of the hearing, the trial court granted the State's motion and ruled that Cormier's out-of-court, testimonial statements to law enforcement officers would be admitted at trial under the doctrine of forfeiture by wrongdoing. Sears objected to the trial court's ruling based on Sears's Sixth Amendment right of confrontation. The trial court overruled Sears's objection, explaining that under the United States Supreme Court's holdings in *Davis v. Washington*, 547 U.S. 813

(2006), and *Giles v. California*, 554 U.S. 353 (2008), Sears had forfeited his right to confront Cormier.

On appeal, Sears argues that the trial court abused its discretion in granting the State's motion for a finding of forfeiture by wrongdoing because the State failed to present sufficient evidence at the hearing to show: (1) that Sears was the person who made the recorded telephone calls, or (2) that Sears's actions, in fact, procured Cormier's absence at trial. With respect to his second point, Sears contends that there is no evidence that any purported threats or bribes made by or on behalf of Sears were actually communicated to Cormier. Sears also argues that the evidence presented at the hearing supports numerous, legitimate reasons as to why Cormier did not appear to testify and that the trial court therefore erred in concluding that Sears's absence at trial was the result of Sears's wrongful actions.

We first address Sears's argument that the trial court abused its discretion by relying upon the recorded telephone calls because the State failed to make a sufficient showing that Sears was the person who made the calls. In a hearing to determine the admissibility of evidence under Rule 104(a), "[t]he trial judge makes a legal ruling to admit or exclude evidence based upon the relevance and reliability of the factual information submitted by the parties." *Ford v. State*, 305 S.W.3d 530, 536 (Tex. Crim. App. 2009). A trial court abuses its discretion if, in making its ruling

on the admissibility of the evidence, it relies on information that is not shown to have sufficient indicia of relevance and reliability to serve as the factual basis for the trial court's ruling. *See id.* at 536, 539. At the hearing, the sergeant testified that an inmate must enter his personal PIN number and utilize the system's voice recognition technology in order to make a telephone call at the Jefferson County Correctional Facility. She explained that this is a requirement that is followed every time an inmate uses the telephone. She testified that she had listened to the specific calls at issue and that in those calls, Sears stated his name in response to a prompt by the system, the system successfully recognized Sears's voice, and the system permitted the calls to go through. Additionally, the sergeant identified State's Exhibit 6 as containing recordings of the telephone calls made by Sears and stated that she was able to identify Sears's voice on the recordings. She also explained that the recordings were prepared on a device capable of making accurate recordings, that the recordings were accurate, and that they did not appear to be altered in any way. In all three of the recordings, the caller identifies himself as "Sauce." In the second recording, the female that Sauce calls refers to him throughout the call as "Armaud[.]" Based on this evidence, the trial court could have reasonably concluded that the same person made all three calls and that that person was Sears. Additionally, all three of the recordings reference an individual named "K," and

there was testimony at the hearing that Kadrian Cormier goes by the nickname, "K." The caller in the third recording also references "Laura," the name of the complaining witness in this case. We conclude that the sergeant's testimony and the content of the recordings support the trial court's implied finding that Sears was the caller in the recorded telephone calls and that the recordings were sufficiently relevant and reliable to serve as a factual basis for the trial court's ruling. The trial court, therefore, did not abuse its discretion in relying on the recordings in making its ruling regarding the admissibility of Cormier's statements. *See Ford*, 305 S.W.3d at 536, 539.

Further, viewing the evidence in the light most favorable to the trial court's ruling, we conclude that the record supports the trial court's implied findings that Cormier's absence at trial was the result of Sears's misconduct and that Sears intended to prevent Cormier from testifying. Although the investigator testified that Cormier gave him several reasons as to why he could not meet with him, including that Cormier had to do things with his children or that he had to take his girlfriend to the doctor, the trial court was free to disbelieve the excuses that Cormier gave to the investigator and instead credit the other evidence in the record tending to show that Sears had engaged in misconduct prior to trial that was intended to, and did, prevent Cormier from testifying at trial. This evidence included the investigator's

66

testimony, which tended to show that Cormier was avoiding the investigator and his attempts to serve him with a subpoena, as well as the three recorded telephone calls, which, when viewed in the light most favorable to the trial court's ruling, reflect that Sears discussed arrangements with various family members and acquaintances to threaten and bribe Cormier so that he would not testify at trial. Significantly, in the third recording, Sears speaks to a female named Bree and specifically asks her if she has talked to Cormier about "that thing . . . I had told you to ask[.]" When Bree asks for clarification, Sears states: "About when his house got ran in. I'm talking about with him and that ho going to court. That's what I'm talking about." Bree responds that she did speak with Cormier and that "[h]e said that he not going." Thus, contrary to Sears' assertions, the record contains evidence from which the trial court could have reasonably inferred that Cormier received at least some of Sears's messages or threats to not come to court. Based on the record before us, we cannot conclude that the trial court abused its discretion in admitting Cormier's out-of-court statements based on its conclusion that Sears forfeited by wrongdoing his rights under the Confrontation Clause. *See Giles*, 554 U.S. at 359-60; *Gonzalez*, 195 S.W.3d at 120, 125-26. We overrule Sears's third issue.

## VI.    Conclusion

Because we conclude that the evidence is legally insufficient to support Sears's conviction for aggravated robbery, and because we conclude that modification of the judgment to reflect a conviction for the lesser-included offense of robbery is appropriate under *Thornton*, we modify the judgment and render a conviction for robbery. *See* Tex. Penal Code Ann. § 29.02(a)(2); *Thornton*, 425 S.W.3d at 299-300. In turn, we further reform the judgment to delete the deadly weapon finding. As modified, we affirm the finding of guilt. We reverse the portion of the judgment imposing punishment, and we remand the cause to the trial court for a new punishment hearing.

AFFIRMED AS MODIFIED IN PART; REVERSED AND REMANDED IN PART.

_____
CHARLES KREGER
Justice

Submitted on January 25, 2016
Opinion Delivered January 31, 2017
Do not publish

Before Kreger, Horton, and Johnson, JJ.